**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ONITA MACK, | ) | Case No. 14-cv-2943 |
| | ) | |
| Plaintiff, | ) | |
| | ) | Judge Jorge L. Alonso |
| v. | ) | |
| | ) | Magistrate Judge Michael T. Mason |
| CITY OF CHICAGO, | ) | |
| | ) | JURY DEMANDED |
| Defendant. | ) | |

<u>**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION OF SUMMARY JUDGMENT**</u>
<u>**AND MEMORANDUM IN SUPPORT**</u>

Plaintiff Onita Mack ("Plaintiff") responds to Defendant City of Chicago's ("Defendant")

Motion for Summary Judgment and Memorandum in Support[1] ("Motion") as follows:

<u>**Introduction**</u>[2]

In its Motion, Defendant relies on an incomplete set of facts and inaccurate portrayals of

the law. For the reasons stated herein, Defendant is liable for sexual harassment, sex

discrimination, and retaliation against Plaintiff. As such, Defendant's Motion should be denied.

<u>**Statement of Facts**</u>[3]

In June 2010, Plaintiff began working for Defendant in the Office of Emergency

Management and Communications ("OEMC") as a traffic control aide hourly ("TCAH"), where

she worked on the Congress detail through August 2011. Response to Defendant's Statement of

Facts ("RSOF"), ¶¶ 1, 9-11; SOF, ¶ 8. When Plaintiff started working with Defendant, she was

provided superficial training on a single sexual harassment policy. SOF, ¶ 6. Plaintiff was

---

[1] In an apparent effort to circumvent the Local Rules, Defendant has written its Motion in font smaller than 12-point font to fit more text than is permitted into its Motion. Dkt. 73; L.R. 5.2(c); L.R. 7.1. Pursuant to L.R. 5.2(e), such noncompliance subjects Defendant's Motion to being stricken by the court.
[2] Unreported case law is filed herewith as Exhibit 8.
[3] Facts are more fully set forth in Plaintiff's Response to Defendant's Local Rule 56.1(a)(3) Statement of Undisputed Material Facts and Plaintiff's Statement of Additional Material Facts Pursuant to Local Rule 56.1(b)(3) ("SOF"), both of which are filed herewith.

trained to, if confronted with sexually harassing conduct, notify a supervisor or superintendent at OEMC. SOF, ¶ 7. Plaintiff was not trained to notify a sexual harassment office or sexual harassment liaison. SOF, ¶ 7. Superintendents at OEMC were required to report sexual harassment up the chain of command or to a sexual harassment liaison. SOF, ¶¶ 15-17.

While working on the Congress detail, Plaintiff worked with TCAH Lead ("Lead") Jerod Harden ("Harden") and Superintendent Bernard Austin ("Austin"). SOF, ¶ 8. Leads, including Harden, had the discretion to, among other things, assign TCAHs to a specific post, issue write-ups for TCAHs, and write Performance Evaluation Reports. SOF, ¶¶ 3-4. Performance Evaluation Reports could be a basis for sending a TCAH home without pay. SOF, ¶ 5. Superintendents, like Austin, have the discretion to choose who will be Leads, assign work tasks to TCAHs, and send TCAHs home without pay as a disciplinary measure. SOF, ¶ 2. Austin had the authority to decide and recommend which TCAHs should receive parking ticket training, which conferred additional job responsibilities. SOF, ¶¶11-12.

Every time Plaintiff worked on the Congress detail with Harden through August 2011, Harden subjected Plaintiff to offensive, sexually inappropriate behavior and comments. SOF, ¶ 9. Harden's actions included, but were not limited to, repeatedly commenting on his sexual prowess, repeatedly commenting and gesturing regarding the length of his penis, repeatedly sexually soliciting Plaintiff, and having his attempt to kiss Plaintiff force her into busy traffic. *Id.*

In early 2011, after Plaintiff expressed interest in parking ticket training, Austin made such training for Plaintiff contingent on Plaintiff's provision of sexual favors to Austin, but Plaintiff refused. SOF, ¶¶ 11-12; RSOF, ¶¶37, 43. During that time period, Austin stared at Plaintiff's breasts and body in addition to inappropriately leaning in toward Plaintiff. SOF, ¶ 10.

In February 2011, Plaintiff complained to Lead Jerry Seger ("Seger") about Austin's conduct. SOF, ¶ 11. Seger responded, "Yeah, that's how [Austin] is with women." *Id.*

In accordance with Plaintiff's training, Plaintiff complained in March 2011 to Austin about all of Harden's sexually harassing behavior. SOF, ¶¶ 7, 13, 15-17. Austin did not report Harden's conduct or Plaintiff's complaints to then-Director John Botica, a sexual harassment liaison, or otherwise up the chain of command, but instead discouraged Plaintiff from making a complaint at all. SOF, ¶¶ 15-17, 24-26, 40. Austin notified Harden of Plaintiff's complaint, which caused Harden to aggressively confront Plaintiff about her complaint in March 2011, placing her in fear. SOF, ¶¶ 13-14. Afterward, Harden refused to pick up Plaintiff after her shift, resulting in a Performance Evaluation Report that Plaintiff did not see until her March 27, 2015 deposition in this matter. SOF, ¶¶ 18-19.

In June 2011, Superintendent Naureen Cooney ("Cooney") became aware that Harden was using the term "cocksucker" in the workplace. SOF, ¶ 20. Cooney only informed Austin of Harden's use of a sexual term in the workplace. *Id.* Austin did not discuss Harden's use of the term "cocksucker" with Harden, and did not report this behavior to anyone else. SOF, ¶ 21.

In September 2011, Defendant began its investigation into Plaintiff's allegations of sexual harassment. SOF, ¶ 22. In December 2011 or January 2012, Plaintiff was informed by a supervisor that Defendant was trying to terminate Plaintiff's employment. SOF, ¶ 28.

In January 2012, Cooney, who is in charge of the OEMC scheduling office, learned of Plaintiff's complaint of sexual harassment. SOF, ¶¶ 27, 29; RSOF, ¶ 67. Cooney was responsible for creating "Do Not Work" lists concerning TCAHs in accordance with Defendant's Availability Policy. SOF, ¶¶ 29-30. The Availability Policy, which was to be "strictly enforced," required a TCAH's removal from the schedule for the subsequent month in the event

of one "no call/no show" or other absences.  SOF, ¶ 30; RSOF, ¶ 71.  Although Plaintiff always called in if she was going to be absent, Plaintiff was placed on the April 2012 "Do Not Work" list for two alleged March 2012 "no call/no shows."  SOF, ¶ 21; RSOF, ¶¶ 75-76.  Defendant did not "strictly enforce" the Availability Policy against males who did not complain of sexual harassment, with Cooney admitting as such.  SOF, ¶¶ 32-39.

## Legal Standard

Summary judgment is appropriate only, when viewing all facts in the light most favorable to the non-moving party, "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue of material fact such that the moving party is entitled to summary judgment as a matter of law."  Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  This standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues.  *Courtney v. Biosound, Inc.*, 42 F.3d 414, 423 (7th Cir. 1994).

## Argument

### I.    Defendant is Liable for Sexual Harassment against Plaintiff

At best, Defendant has created a genuine issue of material fact as to Plaintiff's claim of sexual harassment.  "In order for a plaintiff to prevail on a sexual harassment claim, she must demonstrate that: (1) she was subject to unwanted harassment; (2) the harassment was based on sex; (3) the harassment created an intimidating, hostile or offensive working environment; and (4) there is a basis for employer liability."  *Jarvis v. Sigmatron International Inc.*, 223 F.Supp.2d 981, 984 (N.D. Ill. 2002).  Defendant does not dispute that there is a genuine issue of material fact regarding the first three prima facie elements and waives any such argument accordingly.[4]

---

[4] In any event, such arguments regarding the first three elements would have no merit.  In the context of sexual harassment, "uninvited sexual solicitations; intimidating words or acts; [and] obscene language or

*Dobrzeniecki v. Salisbury*, 2013 U.S. Dist. LEXIS 17841, at **10-11 (N.D. Ill. 2013); *see also U.S. v. Elst*, 579 F.3d. 740, 747 (7th Cir. 2010).

### A. Defendant is Strictly Liable for Sexual Harassment

Contrary to Defendant's assertions, both Austin and Harden were Plaintiff's supervisors for purposes of Title VII, thus subjecting Defendant to strict liability. "[I]t is manifest that the essence of supervisory status is the authority to affect the terms and conditions of the victim's employment. This authority primarily consists of the power to hire, fire, demote, promote, transfer, *or* discipline an employee. Absent an entrustment of at least *some* of this authority, an employee does not qualify as a supervisor for imputing liability to the employer" for purposes of Title VII. *Parkins v. Civil Constructors of Illinois*, 163 F.3d 1027, 1034 (7th Cir. 1998) (emphasis added). An individual is also a Title VII supervisor where he or she has the authority to institute a "reassignment with significantly different responsibilities." *Vance v. Ball State University*, 133 S. Ct. 2434, 2443 (2013). Both Austin and Harden were Title VII supervisors.

### 1. Austin was Plaintiff's Supervisor for Purposes of Title VII

Austin was entrusted with the authority enumerated in *Parkins*, thus making him a Title VII supervisor. First and foremost, Austin conceded that he had the authority to send a TCAH home without pay as a disciplinary measure. SOF, ¶ 2; RSOF, ¶¶ 19-20. In *Gracia v. Sigmatron International, Inc.*, 2013 U.S. Dist. LEXIS 153399, **26-27 (N.D. Ill. 2013), the court held that an individual who did not have the power to fire the plaintiff was a Title VII supervisor by virtue of the fact that he could discipline the plaintiff.[5] Austin had the independent discretion to send TCAHs home without pay as a disciplinary measure. SOF, ¶ 2; RSOF, ¶ 19. Austin also had the

---

gestures" are offensive. *Jarvis*, 223 F.Supp.2d at 985. Harden and Austin are guilty of these actions. SOF, ¶¶ 8-11; *see also* RSOF, ¶ 1.
[5] *Gracia*, 2013 U.S. Dist. LEXIS at **26-27 ("Thus, although the [harasser] may not have been able to fire [the plaintiff] by his lonesome, [citation omitted], the fact that he could discipline her makes him her supervisor for Title VII purposes.").

authority to write and sign off on Performance Evaluation Reports regarding TCAHs, and such reports could form the basis for sending a TCAH home without pay. SOF, ¶ 5; RSOF, ¶ 20. An employee's ability to affect another employee's compensation is given "special weight" in evaluating supervisory status. *Fields v. Illinois Department of Corrections*, 2006 U.S. Dist. LEXIS 64967, *42 (S.D. Ill. 2006). Austin was a Title VII supervisor.

Second, Austin's authority to transfer an employee to a materially different position renders him a supervisor. Austin had the discretion to assign a TCAH to the position of a Lead, which qualifies him as a supervisor. SOF, ¶ 2; RSOF, ¶¶ 2, 13, 15, 16, 19; *Vance*, 133 S. Ct. at 2443. TCAHs are limited to controlling the flow of pedestrian and vehicular traffic at assigned intersections. RSOF, ¶ 2. By becoming a Lead, a TCAH would have the newfound responsibilities of being able to write up other TCAHs, being able to write Performance Evaluation Reports for other TCAHs, supervising other TCAHs' work, and assigning TCAHs to work posts. SOF, ¶¶ 3-4; RSOF, ¶ 13. Vested with the authority to designate a TCAH as a Lead, Austin had the authority to institute this remarkable change in a TCAH's job role. SOF, ¶ 2. This criterion establishes Austin as a Title VII supervisor.[6] *Vance*, 133 S.Ct. at 2443.

### 2.     Harden was Plaintiff's Supervisor for Purposes of Title VII

Harden was Plaintiff's Title VII supervisor as well, and Defendant's argument to the contrary is a matter of form over substance. By arguing that Harden had the title of a TCAH, Defendant ignores the facts surrounding his actual job duties as a Lead. In *Gawley v. Indiana University*, 276 F.3d 301, 311 (7th Cir. 2000), the court held that a harasser constituted a Title VII supervisor where the harasser had the authority to initiate disciplinary proceedings against

---

[6] Defendant's citation to *Zuidema v. Raymond Christopher, Inc.*, 866 F.Supp.2d 933 (N.D. Ill. 2011), is confounding. *Zuidema* concerned issues of preemption and the scope of employment in the tort context on a motion to dismiss (which was denied). These issues simply do not apply to a determination of supervisory status on a motion for summary judgment.

the plaintiff, but still did not have the authority to hire or fire the plaintiff. Here, Harden had the authority to assign Plaintiff to a given post, write up Plaintiff, and write Performance Evaluation Reports regarding Plaintiff. SOF, ¶¶ 3-4. Performance Evaluation Reports could be the basis for sending a TCAH home without pay. SOF, ¶ 5; *Fields*, 2006 U.S. Dist. LEXIS at **41-42 ("special weight" is given to matters concerning compensation). Harden's job duties impose supervisory status.[7]

### 3. Plaintiff was Subjected to an Adverse Employment Action in the Course of Defendant's Sexual Harassment

There can be no question that Plaintiff being denied training as a result of her refusal to provide Austin sexual favors constitutes an adverse employment action. *Fabiyi v. McDonald's Corporation*, 2014 U.S. Dist. LEXIS 32876, **28-29 (N.D. Ill. 2014); *see also Durkin v. City of Chicago*, 341 F.3d 606, 611 (7th Cir. 2003); SOF, ¶¶ 11-12; RSOF, ¶¶37, 43. Moreover, Harden's refusal to pick up Plaintiff after her shift in April 2011, which then led to discipline against Plaintiff, qualifies as an adverse employment action. *See Lancaster-Williams v. PODS Enterprises*, 2010 U.S. Dist. LEXIS 58974, *19 (N.D. Ill. 2010). Because of the foregoing, Defendant is strictly liable for the sexual harassment against Plaintiff. *Rhodes v. Illinois Department of Transportation*, 359 F.3d 498, 505 (7th Cir. 2004).

### B. Defendant was Negligent in Discovering and Remedying Sexual Harassment

Alternatively, if neither Austin nor Harden were Title VII supervisors, there is still a basis for employer liability regarding sexual harassment by virtue of Defendant's negligence after it was informed in March 2011 of the harassment against Plaintiff. An employer will be liable for

---

[7] Defendant's incorrectly relies on *Lambert v. Peri Formworks Systems, Inc.*, 723 F.3d 863 (7th Cir. 2013), for the premise that Harden is Plaintiff's coworker rather than a supervisor. Unlike Austin and Harden, the "yard leads" in *Lambert* did not have any authority to initiate discipline. *Id.* at 867. This is a crucial distinction that renders *Lambert* inapplicable to the analysis of supervisory status. *Gawley*, 276 F.3d at 311; RSOF, ¶¶ 2, 13.

sexual harassment if the harasser is the plaintiff's coworker and the employer was "negligent either in discovering or remedying the harassment. *Parkins*, 163 F.3d at 1033.

As a preliminary matter, it is undisputed that Plaintiff complained to Austin about sexual harassment in March 2011.[8]  SOF, ¶ 13; RSOF, ¶ 46.  In doing so, Plaintiff acted reasonably by complaining to Austin due to Austin's admitted requirement to report complaints of sexual harassment.  SOF, ¶¶ 13-16; *Lambert v. Peri Formworks Systems, Inc.*, 723 F.3d 863, 866 (7th Cir. 2013) ("Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.").[9]

Austin's subsequent actions and omissions subject Defendant to liability.  Although Austin was required to transmit Plaintiff's complaint up the chain of command, to the sexual harassment office, or to the sexual harassment liaison, Austin only notified Harden and TCAH Monica Webb.[10]  SOF, ¶¶ 13-16, 24-26.  Furthermore, upon giving his statement in the course of Defendant's sexual harassment investigation and verifying that such statement was complete and

---

[8] This, of course, presumes that Defendant was not aware of Austin's harassing behavior prior to Plaintiff's complaint.  This is an unwarranted presumption, as there is evidence that Austin's conduct toward women was known throughout the workplace.  SOF, ¶ 11 ("Yeah, that's how [Austin] is with women.").

[9] Defendant's argument that only Plaintiff's August 5, 2011 written complaint is sufficient to trigger notice is ridiculous and contrary to case law.  *See Lambert*, 723 F.3d at 866 (employee may complain to individual who can be reasonably expected to refer complaint to necessary individual).  Defendant relies upon *Bombaci v. Journal Community Publishing Group, Inc.*, 482 F.3d 979 (7th Cir. 2007), but that case is distinguishable from the present matter.  In *Bombaci*, the person to whom the plaintiff complained was not designated as someone who could receive complaints.  *Id.* at 984.  Here, Austin admitted that, pursuant to Defendant's policy, he was required to pass on complaints of sexual harassment.  SOF, ¶¶ 13-16.  Thus, Plaintiff could reasonably expect that Austin would at least forward Plaintiff's complaint to the correct people.  *Lambert*, 723 F.3d at 866.  In any event, Defendant acknowledged that its sexual harassment office received Plaintiff's complaint as early as May 18, 2011.  SOF, ¶¶ 13, 22.

[10] The unreasonableness of Austin's actions in this regard is also evidenced by Harden aggressively approaching Plaintiff afterward and intimidating her for considering making a complaint.  SOF, ¶ 14.  These actions occurred directly because Austin failed to carry out his required duties.

accurate, Austin noted that he only notified Harden and Monica Webb of Plaintiff's complaint. SOF, ¶¶ 24-26. In addition, Austin instructed Plaintiff not to complain about sexual harassment by Harden because of the alleged adverse effects on Harden. SOF, ¶ 40. Austin acted contrary to his obligations under Defendant's sexual harassment policy, which is negligent. SOF, ¶¶ 24-26; *EEOC v. Management Hospitality of Racine*, 666 F.3d 422, 435 (7th Cir. 2012), *citing Clark v. UPS*, 400 F.3d 341, 350 (6th Cir. 2005) ("The effectiveness of an employer's sexual harassment policy depends upon the effectiveness of those who are designed to implement it.").

Assuming *arguendo* that Austin transmitted Plaintiff's March 2011 complaint to the required individuals, Defendant negligently dragged its feet in taking steps to remedy Plaintiff's complaint. SOF, ¶ 15. As stated in *Prindle v. TNT Logistics of North America*, 331 F.Supp.2d 739, 752 (N.D. Ill. 2004), a gap of four months between a complaint and remedial action leads to a genuine issue of fact regarding negligence, but Defendant caused a gap of six months. On the intake form regarding Plaintiff's complaint of sexual harassment, Defendant noted that its sexual harassment office received Plaintiff's complaint on May 18, 2011, despite Plaintiff complaining to Austin in March 2011. SOF, ¶¶ 13, 22. If this is true, it took Austin or Austin's superiors two months to follow through on Plaintiff's March 2011 complaint to Austin. SOF, ¶¶ 13-16, 22. Defendant then did not initiate its investigation into Plaintiff's sexual harassment allegations until September 19, 2011. SOF, ¶¶ 13-16, 22. Defendant's inaction led to a six month gap between Plaintiff's first complaint and the start of Defendant's investigation, during which time Plaintiff was still subjected to sexual harassment. SOF, ¶¶ 9, 13-16, 20-22. Defendant was negligent, and there is a basis for employer liability. *See Prindle*, 331 F.Supp.2d at 752.

Although Defendant relies on an alleged cessation of harassment, this argument has no basis in fact. Plaintiff testified that Harden engaged in sexually inappropriate behavior each time

that Plaintiff worked on the Congress detail, and Plaintiff worked on the Congress detail until August 2011. SOF, ¶¶ 8-9. Additionally, it is undisputed that Harden continued to use the term "cocksucker" in the workplace after March 2011, and Austin and Cooney did not notify the required individuals despite being on notice of such conduct. SOF, ¶¶ 20-21. Nevertheless, even if the harassment against Plaintiff ceased in March 2011, it would be nonsensical to call Defendant's six months of *inaction* a reasonable preventative measure.[11] *See Prindle*, 331 F.Supp.2d at 752 (four months is unreasonable). There is a basis for employer liability.

### C. Defendant cannot Establish the *Faragher/Ellerth* Affirmative Defense

Defendant is not entitled to the *Faragher/Ellerth* affirmative defense because (1) it did not take reasonable care to prevent and correct sexual harassment and (2) Plaintiff did not fail to take advantage of preventive or corrective measures. *Management Hospitality of Racine*, 666 F.3d at 434.[12] Notably, Defendant retains the burden of proof regarding the *Faragher/Ellerth* defense. *EEOC v. V & J Foods, Inc.*, 507 F.3d 575, 580 (7th Cir. 2007).

### 1. Defendant Did Not Take Reasonable Care to Prevent and Correct Sexual Harassment

As to the first element, the mere existence of a sexual harassment policy is insufficient to meet Defendant's burden regarding the *Faragher/Ellerth* affirmative defense. Rather, where there is evidence that individuals failed to carry out their duties pursuant to the policy, a reasonable jury could find that the first *Faragher/Ellerth* element is not met. *Management Hospitality of Racine*, 666 F.3d at 435, *citing Clark*, 400 F.3d at 350. As discussed in Section

---

[11] As a policy matter, if Defendant's cessation argument is accepted, defendants in Title VII sexual harassment cases would be permitted to willfully turn a blind eye to sexually harassing conduct. Then, on a sufficiently lengthy timeline, the conduct may cease and the defendant could avoid liability due to its willful blindness. This stance is untenable and contrary to the purposes underlying Title VII.

[12] The *Faragher/Ellerth* affirmative defense also relies on the presumption of a lack of adverse employment action in the course of the sexual harassment. *Management Hospitality of Racine*, 666 F.3d at 434. Plaintiff maintains that she was the victim of such an adverse employment action. *See* Section I.A.3., *supra*.

I.B., *supra*, Austin was required to report Plaintiff's allegations of sexual harassment but did not do so. Instead, Austin's inaction led to a six-month delay between Plaintiff's March 2011 complaint and Defendant's first steps toward remedial action. SOF, ¶¶ 9, 13-16, 20-22. As such, there is a genuine issue of material fact as to whether Defendant acted reasonably to prevent or correct sexual harassment. *See Prindle*, 331 F.Supp.2d at 752.

Strangely, there are also two conflicting sexual harassment policies at issue in this case, but Plaintiff was only trained on one. RSOF, ¶¶ 24-28. The policy upon which Plaintiff was trained requires supervisors to report allegations of sexual harassment to their superiors, the sexual harassment office, or the sexual harassment liaison. *Id.* The other policy proffered by Defendant, however, contains no such provision. *Id.* This ambiguity leads to a conflict in complaint procedures, which renders Defendant's sexual harassment policy (or policies) unreasonable. *V & J Foods, Inc.*, 507 F.3d at 578-579 (holding that policies that are likely to confuse to not meet the first element of the *Faragher/Ellerth* defense).

### 2. Plaintiff took Advantage of the Available Corrective Opportunities

Plaintiff also reasonably took advantage of the corrective opportunities to available to her. It is undisputed that Austin was required to report complaints of sexual harassment, and Plaintiff complained to Austin about sexual harassment in March 2011. *See* Section I.B., *supra*; SOF, ¶¶ 13-16. In light of Austin's required duties, this was a reasonable action for Plaintiff to take in order to have her complaint investigated. *Lambert*, 723 F.3d at 866.

## II. Defendant is Liable for Sex Discrimination against Plaintiff

There are also genuine issues of material fact pertaining to Plaintiff's sex discrimination claim. Plaintiff must show that (1) she is a member of a protected class, (2) she was meeting her employer's legitimate performance expectations, (3) she suffered an adverse employment action,

and (4) she was treated less favorably than similarly situated individuals. *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Once Plaintiff meets each of these elements, she must prove that Defendant's stated reason for an adverse employment action is pretextual. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804-805 (1973). Here, Defendant does not dispute that Plaintiff was a member of a protected class. Dkt. 73, pp. 10-13.

A. **There is a Genuine Issue of Material Fact as to Whether Plaintiff Met Defendant's Legitimate Expectations**

Defendant has merely created a genuine issue of material fact as to whether Plaintiff met its legitimate expectations. The parties dispute whether Plaintiff had two "no call/no shows" in March 2012, and all reasonable inferences must be granted in Plaintiff's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587; Dkt. 73, p. 15; SOF, ¶ 31. For summary judgment, the court must accept that Plaintiff was not a "no call/no show." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587

B. **Plaintiff was Subjected to Adverse Employment Actions**

Plaintiff was subjected to adverse employment actions because of her sex. In order to qualify as an adverse employment action for purposes of discrimination, the action "must materially alter the terms and conditions of employment." *Whittaker v. Northern Illinois University*, 424 F.3d 640, 647 (7th Cir. 2005). "Of course, adverse job action is not limited solely to loss or reduction of pay or monetary benefits." *Id.* at 647-648. Here, the fabrication of Plaintiff's alleged "no call/no shows" in March 2012 is an adverse employment action. *Lancaster-Williams*, 2010 U.S. Dist. LEXIS at *19 (false disciplinary notices are adverse employment actions where accompanied by tangible job consequences); SOF, ¶ 21. Plaintiff's April 2012 suspension without pay is an adverse employment action as well, and resulted from these two alleged "no call/no shows." *Luevano v. Wal-Mart Stores, Inc.*, 722 F.3d 1014, 1029

(7th Cir. 2013). Furthermore, the denial of training because Austin required sexual favors in return is an adverse employment action. *Fabiyi*, 2014 U.S. Dist. LEXIS at **28-29; *Durkin*, 341 F.3d at 611; SOF, ¶¶ 11-12; RSOF, ¶¶ 37, 43. Plaintiff has met the third prima facie element of her sex discrimination case.

### C.  Similarly Situated Males were Treated more Favorably than Plaintiff

There is an issue of fact as to whether similarly situated males were treated more favorably than Plaintiff. Specifically, male TCAHs were not subjected to the terms of the Availability Policy. SOF, ¶¶ 30, 32-39; RSOF, ¶ 71. Defendant's Availability Policy required that TCAHs with a single "no call/no show" must be removed from the schedule for the subsequent month. RSOF, ¶ 71. This policy was not enforced against Miguel Pinero, Daniel Simmons, and David Witherspoon, all of whom were male TCAHs. SOF, ¶¶ 32-39. Plaintiff, however, was removed from the schedule for the subsequent month following two false "no call/no shows." SOF, ¶¶ 21, 31. In light of these facts, Cooney admitted that the Availability Policy was not "strictly enforced" as intended. SOF, ¶ 39. Because of this differing treatment, a reasonable jury could believe that Plaintiff was suspended because she is female.

### D.  Defendant's Reason for Placing Plaintiff on the April 2012 "Do Not Work" List is Pretextual

Even assuming that Plaintiff was a "no call/no show" in March 2012, Defendant's reason for placing Plaintiff on the April 2012 "Do Not Work" list was pretextual. For pretext, Plaintiff must demonstrate that Defendant's nondiscriminatory reason for suspending her either "(1) has no basis in fact; (2) was not the real reason; or (3) was insufficient to motivate the action." *Simmons v. Department of Central Management Services*, 2004 U.S. Dist. LEXIS 22968, **26-27 (N.D. Ill. 2004). As stated above, male TCAHs were not subject to enforcement of the Availability Policy. SOF, ¶¶ 32-39. Based on Defendant's treatment of males with multiple

13

absences and "no call/no shows," a reasonable jury could conclude that Plaintiff's alleged "no call/no show" status for March 2012 was insufficient to motivate Defendant placing her on the April 2012 "Do Not Work" list. There is a genuine issue of material fact as to pretext.

## III. Defendant is Liable for Retaliation against Plaintiff

There is a genuine issue of material fact as to whether Plaintiff was retaliated against for engaging in a protected activity. In order to establish a *prima facie* case of retaliation under the direct method, Plaintiff must show that: (1) she engaged in a protected activity; (2) Defendant committed an adverse employment action against her;[13] and (3) a causal nexus existed between the protected activity and the adverse employment action. *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). Under the indirect method, the third element is replaced with the requirement that Plaintiff show that she was performing her job satisfactorily[14] and that she was treated less favorably than similarly situated individuals.[15] *Id.* at 786-787. Also under the indirect method, Defendant must articulate nondiscriminatory reasons for its actions, and, if it does, Plaintiff must show that those reasons are pretextual.[16] *Id.* at 787. Defendant does not

---

[13] This element is discussed in connection with Plaintiff's sex discrimination claim. *See* Section II.B., *supra*. However, the standard for what constitutes an adverse employment action in the retaliation context is more expansive. For Title VII retaliation, an "adverse employment action" is an action that might "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 52, 68 (2006). The Title VII "anti-retaliation provision, unlike the substantive provision [concerning discrimination and harassment], is not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* at 64. Still, under this broader standard, the false discipline against Plaintiff and Plaintiff's suspension are adverse employment actions for purposes of retaliation. *Lancaster-Williams*, 2010 U.S. Dist. LEXIS at *19; *Luevano*, 722 F.3d at 1029.

[14] This element is discussed in connection with Plaintiff's sex discrimination claim. *See* Section II.A., *supra*.

[15] This element conflates with the causation component of the direct method. *Stephens v. Erickson*, 569 F.3d 779, 786-787 (7th Cir. 2009). This element is also discussed in connection with Plaintiff's sex discrimination claim. This element is discussed in connection with Plaintiff's sex discrimination claim. *See* Section II.C., *supra*. TCAH Miguel Pinero, TCAH Daniel Simmons, and TCAH David Witherspoon had not made any complaints of harassment. SOF, ¶¶ 32-39.

[16] This element is discussed in connection with Plaintiff's sex discrimination claim. *See* Section II.D., *supra*; SOF, ¶¶ 32-39.

challenge the first element and therefore waives any such argument.  *Dobrzeniecki*, 2013 U.S. Dist. LEXIS at **10-11; *see also Elst*, 579 F.3d. at 747.

Contrary to Defendant's assertions, there is causation between Plaintiff engaging in a protected activity and the adverse employment actions against her.  The differing treatment of similarly situated individuals as it pertains to the Availability Policy creates an issue of material fact as to causation.[17]  *Castro v. DeVry University, Inc.*, 786 F.3d 559, 564-565 (7th Cir. 2015).

Cooney, who was responsible for creating Defendant's "Do Not Work" lists, learned of Plaintiff's sexual harassment allegations in January 2012.  SOF, ¶¶ 27, 29-30.  TCAHs who did not complain of harassment were not subjected to a "strictly enforced" Availability Policy and were not treated in accordance with its provisions, yet Plaintiff was subjected to differing treatment.  SOF, ¶¶ 21, 30, 31-39; RSOF, ¶ 71.  Cooney even admitted that the Availability Policy was arbitrarily enforced.  SOF, ¶ 39.  A reasonable jury could believe that Plaintiff's protected activity caused her April 2012 suspension.

## Conclusion

For the reasons stated herein, Plaintiff requests that this Honorable Court deny Defendant's Motion for Summary Judgment and Memorandum in Support in their entirety.

Respectfully Submitted,
Onita Mack,

/s/ Franklin Z. Wolf
One of Her attorneys

Uche O. Asonye – 6209522
Franklin Z. Wolf – 6301208
Asonye & Associates
100 N. LaSalle Street, Suite 2115
Chicago, Illinois 60602
(312) 795-9110

---

[17] Accordingly, this element conflates with the "similarly situated" component of the indirect method. *See* Section II.C., *supra*; *Stephens v. Erickson*, 569 F.3d 779, 786-787 (7th Cir. 2009).

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that I have on this 18th Day of September, 2015, served a true and accurate copy of the foregoing *Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum in Support* by the CM/ECF system to the following:

Ernest Mincy
Elizabeth Sichi
City of Chicago Law Department
Employment Litigation Division
30 N. LaSalle Street, Suite 1020
Chicago, Illinois 60602

Respectfully submitted,
Onita Mack,

/s/ Franklin Z. Wolf
One of Plaintiff's Attorneys

Uche O. Asonye – 6209522
Franklin Z. Wolf – 6301208
Asonye & Associates
100 N. LaSalle Street, Suite 2115
Chicago, Illinois 60602
(312) 795-9110