**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ONITA MACK, | ) | |
| | ) | |
| Plaintiff, | ) | 14 C 2943 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff sues the City of Chicago for its alleged violations of Title VII. The case is before the Court on the City's Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. For the reasons set forth below, the Court grants in part and denies in part the motion.

## Facts

Plaintiff is a woman who has worked for the City in its Office of Emergency Communications Traffic Management Authority ("OEMC") as a Traffic Control Aide-Hourly ("TCAH") since June 1, 2010. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 1.) TCAHs control the flow of traffic at assigned intersections and areas leading into and out of special events ("Details") and work varying hours depending on the City's needs. (*Id.* ¶¶ 2, 4.)[1]

There are four superintendents who oversee TCAHs: Michelle DiCola, Naureen Cooney, T.J. Byrnes, and Bernard Austin. (*Id.* ¶ 17.) Together, the supervisors determine which TCAHs will be designated as "leads," who perform additional functions like driving TCAHs to their posts,

---

[1] Plaintiff denies in part these paragraphs but the denial does not controvert the facts cited by the Court.

reassigning TCAHs to different posts within a Detail, operating traffic light boxes at intersections, and setting up cones at special events. (*Id.* ¶ 13;[2] Pl.'s Ex. 4, Austin Dep. at 49.) Leads can also fill out personnel evaluation reports on TCAHs, which can be the basis for sending a TCAH home early without pay "if there [is] a significant infraction or safety issue." (Pl.'s Ex. 5, Cooney Dep. at 148.) "Lead" TCAH is not, however, a job classification. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 14.)[3] Leads cannot hire, fire or promote other TCAHs and are subject to the same wage scale as other TCAHs. (*Id.* ¶¶ 14-15.)[4]

One of plaintiff's assignments was the Congress Detail. (*Id.* ¶ 9.)[5] Jerod Harden was a lead assigned to the Congress Detail. (*Id.* ¶ 12.) In September 2010, at the Congress Detail, Harden told plaintiff that he is "good in bed" and "gives good sex," and begged plaintiff to go on a date with him. (*Id.* ¶¶ 29-30.) On another occasion, when Harden and plaintiff were alone in the OEMC van, he told her that he "had 12 inches" and she "needed 12 inches inside her." (*Id.* ¶ 31.)[6] When the two were outside of the van, Harden tired, unsuccessfully, to kiss plaintiff. (*Id.* ¶ 32.) On another occasion, Harden drove by plaintiff and yelled out the window that she looked like a "whore on a street corner." (*Id.* ¶ 33.) Plaintiff contends that she was harassed by Harden "[e]very time" she worked on the Congress Detail. (Def.'s Ex. C, Pl.'s Dep. at 226.)

---

[2]*See* n.1.

[3]*See* n.1.

[4]*See* n.1.

[5]*See* n.1.

[6]*See* n.1.

2

Plaintiff first reported Harden's conduct to Austin in March 2011. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 46.)[7] Austin told plaintiff to describe Harden's conduct on a "To/From" form and to give the completed form back to him or to OEMC Commissioner John Botica. (*Id.* ¶ 48.)[8] Plaintiff says Austin also told her to think about it before turning in the form because Harden had a wife and three kids and would be unable to work for the City if she turned it in. (*Id.*)

After plaintiff spoke to Austin, he told Harden about plaintiff's allegations and instructed Harden to stay away from her. (*Id.* ¶ 53.)[9] Austin also gave Harden a To/From form and told him to complete it and return it to Austin or Botica. (*Id.*)

At some point between June 2010 and March 2011, Austin said to plaintiff, "You like me don't you?" (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 36.) Sometime before the end of March 2011, Austin asked plaintiff if she would like to take a parking ticket writing class. (*Id.* ¶ 37.) When she said she would, he said: "I'll get you in that class. What part of your body are you going to give me?" (*Id.*) Apparently, Austin also asked plaintiff to go on a date with him.

On August 5, 2011, plaintiff told Superintendent DiCola that Austin was upset with her because she refused to go out with him. (*Id.* ¶ 50.) Plaintiff gave DiCola a To/From form in which she described the alleged harassment by Harden and Austin. (*Id.*) After her shift on August 5, 2011, plaintiff was removed from the Congress Detail to separate her from Harden and Austin. (*Id.* ¶ 57.) After receiving plaintiff's To/From reports, the City's Department of Human

---

[7]*See* n.1.

[8]*See* n.1.

[9]*See* n.1.

3

Resources ("HR") investigated plaintiff's allegations of harassment. (*Id.* ¶ 56.)[10] HR interviewed plaintiff, Harden, Austin, and others and concluded that her allegations of harassment and retaliation were not substantiated. (*Id.*)

In January 2012, OEMC adopted a scheduling policy that required TCAHs to submit their work availability for the entire year instead of doing so on a monthly basis, as they had previously done. (*Id.* ¶ 69.) The policy provided that a "no call/no show" would result in a TCAH being taken off of the schedule for the following month and placed on the "Do Not Work List." (*Id.* ¶ 71[11]; *see* Pl.'s Ex. 5, Cooney Dep. Ex. 5, Scheduling Policy.) A second "no call/no show" would result in the TCAH being put on the "Do Not Work List" for two months. (Pl.'s Ex. 5, Cooney Dep. Ex. 5, Scheduling Policy.) A third "no call/no show" would result in a recommendation for termination. (*Id.*) The policy states in bold type that it "will be strictly enforced beginning 01 FEB 12." (*Id.*)

Though plaintiff denies it, defendant says she was absent from work on March 2, and 3, 2012 without calling in, and thus was put on the "Do Not Work List" for April 2012. (Def.'s LR 56.1(a) Stmt. ¶¶ 75-76; Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 75-76.) Plaintiff was scheduled to work again in May 2012, and continues to be employed as a TCAH today. (Def.'s Ex. D, Cooney Aff. ¶ 7(x); Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 58.)[12]

---

[10]*See* n.1.

[11]*See* n.1.

[12]*See* n.1.

**Discussion**

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, the Court does not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court views all evidence and draws all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

In Count I of the first amended complaint, plaintiff alleges a Title VII claim for sexual harassment. *See* 42 U.S.C. § 2000e-2 ("It shall be an unlawful employment practice for an employer . . . to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . ."); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998) ("Sexual harassment which is so severe or pervasive as to alter the conditions of the victim's employment and creates an abusive working environment violates Title VII.") (quotations omitted). To establish a prima facie case, plaintiff must show that:

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on sex; (3) the sexual harassment had the effect of unreasonably interfering with the plaintiff's work performance in creating an intimidating, hostile or offensive working environment that affected seriously the psychological well-being of the plaintiff; and (4) there is a basis for employer liability.

*Parkins*, 163 F.3d at 1032. Defendant contends that the last element is lacking.

Defendant's liability for sexual harassment "depends upon whether the harasser is the victim's supervisor or merely a co-employee." *Id.* If the harasser is a supervisor and "[the] harassment culminates in a tangible employment action, the employer is strictly liable." *Vance v. Ball State Univ.*, __U.S.__, 133 S. Ct. 2434, 2439 (2013). If the harasser is a supervisor "[b]ut . . . no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). If the harasser is the victim's coworker, not her supervisor, the employer is liable only if "'[it has] been negligent either in discovering or remedying the harassment.'" *Parkins*, 163 F.3d at 1032 (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997)).

"'Supervisor' is a legal term of art for Title VII purposes, and an employee merely having authority to oversee aspects of another employee's job performance does not qualify as a supervisor in the Title VII context." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 506 (7th Cir. 2004). An employee is a supervisor under Title VII only if "the employer has empowered that employee to take tangible employment actions against the victim, *i.e.*, to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Vance*, 133 S. Ct. at 2443 (quoting *Ellerth*, 524 U.S. at 761). It is undisputed that neither superintendents like Austin nor leads like Harden could hire, fire, or promote plaintiff or any other TCAH. (Pl.'s LR 56.1(b)(3)(B) Stmt.

¶¶ 15, 18);[13] *see* Chi., Ill. Mun. Code § 2-29-020 (stating that "[a]ll employees of [OEMC] shall be under the direction and supervision of the executive director of emergency management and communications").

Nonetheless, plaintiff argues that Harden is a supervisor because he could write a report on her performance that might result in her being disciplined. The Seventh Circuit has rejected this argument. *See Rhodes*, 359 F.3d at 506 (stating that "[a] supervisor is someone with the power to *directly* affect the terms and conditions of the plaintiff's employment" and holding that employees who "made recommendations concerning sanctions for rule violations" were not plaintiff's supervisors); *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir. 2002), *overruled in part on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013) (the fact that an employee "provide[s] input into [another's] performance evaluations" does not "establish a Title VII supervisory relationship."). Thus, the record does not support the inference that Harden was plaintiff's supervisor.

Because Harden is plaintiff's co-worker, not her supervisor, the City can be held liable for his alleged conduct only if it "[has] been negligent in discovering or remedying the harassment." *Parkins*, 163 F.3d at 1032. Viewed favorably to plaintiff, the record shows that it was. Plaintiff reported Harden's conduct to Austin in March 2011, but the City did not take her off of the Congress Detail or start to investigate her allegations until August 2011. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 46, 50, 57.) That months-long delay, in the face of what plaintiff says was constant harassment, is sufficient to suggest that the City was negligent in rectifying the situation.

---

[13]*See* n.1.

The situation is different for Austin. Viewed favorably to plaintiff, the record suggests that superintendents had the authority to discipline TCAHs by sending them home without pay before the end of their shifts. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19.) Because the ability to discipline is one of the hallmarks of Title VII supervisory authority, *see Parkins*, 163 F.3d at 1034 ("[supervisory] authority primarily consists of the power to hire, fire, demote, promote, transfer, or *discipline* an employee") (emphasis added), the record suggests that Austin was plaintiff's supervisor.

It does not, however, suggest that Austin's conduct constituted sexual harassment. To be actionable under Title VII, "a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher*, 524 U.S. 775, 787 (1998). Factors that determine whether an environment is sufficiently hostile or abusive include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 787-88 (quotation omitted). As the *Faragher* Court observed, "conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788.

Viewed favorably to plaintiff, the record shows that at some point between June 2010 and March 2011, Austin: (1) said to plaintiff, "You like me don't you?; (2) said he would get her in a parking ticket writing class and asked, "What part of your body are you going to give me?"; and (3) asked her on a date. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶¶ 36, 37, 50.) It is undisputed, however, that Austin never touched plaintiff, his conduct did not cause her to miss any hours or days of work, and she did not report it to anyone until August 5, 2011. (*Id.* ¶¶ 38-39, 50.) Alleged harassment that consists of three incidents over a ten-month period that involved no threats or physical contact, did

not cause plaintiff to lose any pay, and was not reported by plaintiff until–at the earliest–five months later, is not sufficiently severe or pervasive to be actionable under Title VII. *See Adusumilli v. City of Chi.*, 164 F.3d 353, 361 (7th Cir. 1998) ("'simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'") (quoting *Faragher*, 524 U.S. at 788) (internal citations omitted).

Even if Austin's conduct constituted actionable harassment, the record does not suggest that the City is liable for it. There is no evidence that Austin's alleged conduct caused plaintiff to suffer a tangible employment action, *i.e.*, to be "discharge[d], demote[d] or [given an] undesirable reassignment." *Faragher*, 524 U.S. at 808; (*see* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 42 (admitting that "[t]here is no increased compensation or opportunities for career advancement available to a TCAH who takes a ticket-writing class")). Thus, the City cannot be held liable for his alleged actions if it acted reasonably to prevent or correct harassing behavior and plaintiff unreasonably failed to take advantage of preventive or corrective opportunities the City provided. *Vance*, 133 S. Ct. at 2439. There is no dispute that: (1) the City had a written policy prohibiting sexual harassment, which plaintiff received on June 2010; (2) the policy stated that an employee could make a complaint to the Sexual Harassment Officer in the City's HR Department or the designated sexual harassment liaison in any department; (3) Austin's alleged harassment occurred sometime before the end of March 2011; (4) plaintiff first complained about Austin's conduct on August 5, 2011; and (5) on August 5, 2011, the City took plaintiff off the Congress Detail to separate her from Harden and Austin. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 50; Pl.'s Ex. 5, Cooney Dep. Ex. 3, City of Chicago Policy on Sexual Harassment; Def.'s Ex. C, Pl. Dep. at 106, 260.) In short, the record establishes that the City took reasonable steps to prevent sexual harassment, plaintiff did not report Austin's alleged

harassment until five months or more after it occurred, and the City took immediate action to remove her from the allegedly harassing environment as soon as she reported it. Accordingly, the City could not be held liable for Austin's alleged conduct, even if that conduct constituted actionable harassment.

In Counts II and III, plaintiff alleges that the City discriminated and retaliated against her by putting her on the "Do Not Work List" for April 2012.[14] The City says plaintiff cannot make a prima facie case of discrimination or retaliation because its records show that she failed to meet its legitimate expectation of calling in if she were unable to work. (*See* Def.'s LR 56.1(a) Stmt. ¶ 75); *see also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (stating that a prima facie case of sex discrimination requires proof that: "(1) [plaintiff] is a member of a protected class; (2) [plaintiff] was meeting [the City's] legitimate performance expectations; (3) [plaintiff] suffered an adverse employment action; and (4) [plaintiff] was treated less favorably than similarly-situated male employees."); *Stone v. City of Indianapolis Pub. Utilities Div.*, 281 F.3d 640, 644 (7th Cir. 2002) (a prima facie case of retaliation requires evidence that after complaining of harassment or discrimination, plaintiff, and not any similarly situated employee who did not complain, was subjected to an adverse employment action even though she was performing her job satisfactorily). But plaintiff denies that she ever missed work without calling in and identifies three male TCAHs

---

[14]The Court rejects plaintiff's assertion that Austin's failure to enroll her in a ticket writing class also constitutes an adverse employment action, as the record establishes that no such classes were offered to non-lead TCAHs during the relevant period. (*See* Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 37 (admitting that Austin asked her about the parking ticket class in March 2011); Def.'s Ex. D, Cooney Aff. ¶ 8 ("After having reviewed my emails, I determined that the last time that OEMC[] . . . offered a parking ticket class to TCAHs who are not leads was November 2010"); Def.'s Ex. F, Cooney Dep. at 104-05 (testifying in 2015 that the parking ticket class had been offered "two to three times" in the last five years but she "would have to go through [her] e-mails" to determine the dates).)

who did not complain of discrimination or harassment and were "no call/no shows" but were not put on the "Do Not Work List." (Def.'s Ex. C, Pl. Dep. at 315; Pl.'s LR 56.1(b)(3) ¶¶ 32, 34, 36.)[15] Accordingly, viewing the record in her favor, plaintiff has made a prima facie case on both claims.

The burden now shifts to the City to offer a legitimate non-discriminatory/non-retaliatory reason for putting plaintiff on the "Do Not Work List," and if it does so, back to plaintiff to show that the proffered reason is a pretext. *Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 341 (7th Cir. 2001) (discrimination); *Smart v. Ball State Univ.*, 89 F.3d 437, 439 (7th Cir. 1996) (retaliation). The City asserts that it put plaintiff on the list because the 2012 scheduling policy required it to do so for "no call/no shows" and the records of OEMC's scheduling office show that plaintiff was a "no call/no show" on March 2, and 3, 2012. (*See* Def.'s Ex. C, Pl.'s Dep. Ex. 27 at DEF 3587.) Plaintiff contends that explanation is a pretext given the City's admission that TCAHs Miguel Pinero and David Witherspoon were "no call/no shows" in February 2012 but were not put on the list for March 2012, and TCAH Daniel Simmons was a "no call/no show" in January 2014 but was not put on the list for February 2014. (*See* Def.'s Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 32, 34, 36, 39.) It is also undisputed, however, that seventy other TCAHs, both male and female, were placed on the "Do Not Work List" in April 2012. (Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 77.)[16] Given that fact and the eight-month time lapse between plaintiff's last complaint and the allegedly retaliatory action, the fact that two similarly-situated men who did not complain were not put on the "Do Not

---

[15]Contrary to the City's assertion, the evidence plaintiff cites for these fact statements supports her contention that Miguel Pinero, Daniel Simmons, and David Witherspoon did not complain of harassment or discrimination.

[16]*See* n.1.

Work List" in April 2012 (and a third treated similarly two years later) is not, by itself, sufficient to support an inference of either discrimination or retaliation.

## Conclusion

For the reasons set forth above, the Court grants in part and denies in part the City's motion for summary judgment [73]. The motion is granted with respect to the claim of harassment by Austin asserted in Count I and the discrimination and retaliation claims asserted in Counts II and III. The motion is denied with respect to the claim of harassment by Harden asserted in Count I. The parties are ordered to file their final pretrial order on or before November 30, 2015 and appear for a status hearing on December 4, 2015 at 9:30 a.m.

**SO ORDERED.**                                **ENTERED:** October 23, 2015

_____
**HON. JORGE L. ALONSO**
**United States District Judge**